874 F.Supp. 1161 (1994)
In re the DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.
CONOCO INC., (formerly Continental Oil Co.), Plaintiff,
v.
UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.
M.D.L. 378. Civ. A. No. 79-1321.
United States District Court, D. Kansas.
December 30, 1994.
*1162 *1163 *1164 *1165 *1166 Robert F. Ochs, Conoco Inc., Legal Dept., Houston, TX, and Morris, Laing, Evans, Brock & Kennedy, Chartered, Joseph W. Kennedy, Dennis M. Feeney, Wichita, KS, for plaintiff.
Paul Michael, Edward P. Levy, Economic Regulatory Admin., Judicial Litigation Div., U.S. Dept. of Energy, Washington, DC, for Dept. of Energy.

MEMORANDUM AND ORDER
THEIS, District Judge.
This matter is before the court on cross motions for summary judgment. Defendant Department of Energy (DOE) has moved for summary judgment on its counterclaim against plaintiff Conoco, Inc. DOE requests that the court enter an order requiring Conoco to deposit into the escrow account established by the court the sum of $8,635,074 plus additional prejudgment interest accruing after September 30, 1993. Doc. 2150 (DOE's amended cross motion for summary judgment). Conoco opposes DOE's motion and seeks summary judgment in its favor on DOE's counterclaim. Conoco seeks a ruling that it has paid into the court's escrow all monies owed. Doc. 2103. The court heard oral argument on the motions, has considered the voluminous briefs and is now prepared to rule.

Introduction and Background
This action began in 1976 with the filing of the first action by an oil producer seeking to enjoin the Federal Energy Administration, now the DOE, from enforcing Ruling 1974-29. This Ruling, and the regulations it interpreted, required the exclusion of injection wells from the well count in calculating the average daily production per well for qualification for the stripper well exemption from price controls. This court enjoined enforcement of the regulations in question, but ordered the plaintiff oil producers to deposit into escrow the difference between the stripper well price and the controlled price of crude oil affected by the injunction.
In response to the DOE's position that it would continue to enforce Ruling 1974-29 against oil producers who were not parties to the original action and who did not have the benefit of this court's injunction, other oil producers filed suit in this and other federal district courts. Similar injunction and escrow orders were entered, allowing the oil producers to charge the stripper well price and ordering the price differential escrowed. In July 1979, these cases were consolidated by the Judicial Panel on Multidistrict Litigation and were assigned to this court as M.D.L. 378. This court has presided over these consolidated cases since that time.
The Temporary Emergency Court of Appeals (TECA) upheld the validity of the regulations and Ruling 1974-29 in In re The Department of Energy Stripper Well Exemption Litigation, 690 F.2d 1375 (TECA 1982), cert. denied sub nom. Energy Reserves Group, Inc. v. Hodel, 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). Pursuant to *1167 TECA's mandate, the court entered judgment for DOE. At that point, the court considered the action to be, in effect, a government enforcement action under § 209 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, in which the fact of overcharge had been determined and the court was faced with effecting restitution. See In re: The Department of Energy Stripper Well Exemption Litigation, 578 F.Supp. 586, 593 (D.Kan. 1983).
Following negotiations among the parties as to the proper distribution of the escrowed overcharge funds, the parties reached a settlement. The court approved the Final Settlement Agreement (FSA) on July 7, 1986. See In re: The Department of Energy Stripper Well Exemption Litigation, 653 F.Supp. 108 (D.Kan.1986). Since the entry of the FSA, the court has issued numerous opinions adjudicating disputes among various signatories to the FSA regarding the interpretation of the FSA. The court has overseen the distribution of multi-billions in escrowed overcharges to the thousands of participants in the FSA, including oil refiners and resellers, gasoline retailers, airlines, utility companies, the states and territories, and the federal government.
The FSA did not resolve the issue of any remaining liability of the parties for payment of overcharge funds into escrow. The parties to M.D.L. 378 specifically reserved their rights to litigate the issue of remaining liability for overcharges. FSA § II.A.6. A number of parties settled their liability for overcharges with DOE and have paid funds into the court's escrow for distribution via the mechanism set up by the FSA.
In September 1988, the United States of America filed a counterclaim on behalf of DOE against the remaining parties, pursuant to §§ 209 and 211 of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904 note, as incorporated into section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 754(a)(1). The DOE's counterclaim alleges that the remaining parties have not deposited sufficient funds into the court's escrow to satisfy their overcharge liability. In previous opinions, the court has granted judgment in favor of the DOE against other oil producers. See In re: The Department of Energy Stripper Well Exemption Litigation (Sun Company, Inc. and Oryx Energy Company v. Department of Energy), 752 F.Supp. 1527 (D.Kan.1990), aff'd, 944 F.2d 918 (TECA 1991); In re: The Department of Energy Stripper Well Exemption Litigation (Chevron U.S.A., Inc. v. Department of Energy), 746 F.Supp. 1452 (D.Kan.1990), aff'd in part, 944 F.2d 914 (TECA 1991) (reversing only the application of the United States Rule prior to February 1983); In re: The Department of Energy Stripper Well Litigation (Mobil Oil Corp. v. Department of Energy), 722 F.Supp. 649 (D.Kan.1989), on reconsideration, 739 F.Supp. 1446 (D.Kan.1990) (imposing operator liability).
Conoco operated seven properties on which overcharges are still in issue here, and held the division orders for some but not all of the interests in each property. Conoco received and deposited into escrow the overcharges attributable to those interests for which it held the division orders. Conoco states that oil attributable to the remaining interests on those properties was taken in kind. Conoco asserts that it cannot be held liable as operator for oil taken in kind by working interest owners and royalty interest owners.

Summary Judgment Standards
The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial  whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 *1168 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323, 106 S.Ct. at 2552 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials contained in the nonmoving party's pleadings, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. Anderson, 477 U.S. at 254, 106 S.Ct. at 2513.
At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249, 106 S.Ct. at 2510. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are functions of the finder of fact, not the functions of the judge when ruling on a motion for summary judgment. The evidence of the nonmoving party is to be believed. All justifiable inferences are to be drawn in favor of the nonmovant. Id. at 255, 106 S.Ct. at 2513.

Statement of Facts
On December 24, 1974, the Federal Energy Administration (FEA) issued Ruling 1974-29, which prohibited the inclusion of injection wells in the well count when certifying a property pursuant to the stripper well exemption.
On or about October 6, 1976, the first suit challenging the validity of Ruling 1974-29 was filed in this court by Braden-Zenith, Inc., styled Braden-Zenith, Inc. v. Federal Energy Administration, Case No. 76-0429-C6. This case was later consolidated with Energy Reserves Group, Inc. v. Federal Energy Administration, Case No. 77-1146, for briefing on motions for preliminary injunction.
On or about June 16, 1977, this court granted the plaintiffs' request for a preliminary injunction, enjoining the FEA from enforcing Ruling 1974-29 against the plaintiffs and requiring the plaintiffs to escrow with the court the incremental price difference received by plaintiffs as a result of their court-approved stripper certifications.
On or about March 17, 1978, Conoco filed suit in the United States District Court for the Northern District of Texas against the DOE, also seeking to invalidate Ruling 1974-29 and to enjoin DOE from imposing civil or criminal penalties against Conoco for any violations of that ruling. Conoco's suit was later consolidated in that district with similar suits brought by Prosper Energy Corporation, Exxon Corporation, Hunt Oil Company, and Crystal Oil Company against the DOE, collectively styled as Prosper Energy Corp., et al. v. DOE, Civil Action No. CA-3-78-0244-W.
On April 7, 1978, a hearing was held on plaintiffs' application for preliminary injunction, and on March 22, 1979 Judge Woodward issued a preliminary injunction order in favor of Conoco and the other plaintiffs, enjoining DOE's enforcement of the ruling against Conoco. In that injunction order, in addition to finding that plaintiffs had demonstrated a substantial likelihood of prevailing on the merits, the court also ordered that *1169 Conoco and the other plaintiffs escrow the incremental stripper monies, as follows:
(a) At the time of the creation of the escrow account ordered herein, Exxon Corporation, Continental Oil Company, Hunt Oil Company, and Crystal Oil Company shall pay, or cause to be paid, computing from the date these actions were filed by those plaintiffs, the difference between the price received by them from other parties who purchased crude oil produced and sold from the properties in dispute after such properties were certified as stripper well properties and the maximum price for which such crude oil could have been sold to such purchasers without such certifications;
(b) Thereafter, until the final determination of this cause or until further order of the Court, Exxon Corporation, Continental Oil Company, Hunt Oil Company, and Crystal Oil Company shall compute on a monthly basis the difference between the price received by them in the previous month from other parties who purchased crude oil sold from the properties in dispute and the maximum price for which such crude oil could have been sold to such purchasers without certification of such properties as stripper well properties and shall deposit such difference in the escrow account.
Pursuant to the preliminary injunction order, an escrow account was set up by Conoco at First National Bank in Dallas and, in April 1979, an escrow agreement was entered into between Conoco and the First National Bank in Dallas and filed with the Texas Court.
On or about July 3, 1979, the Judicial Panel on Multidistrict Litigation ordered that the consolidated Texas stripper well cases involving Conoco and the other Texas plaintiffs be transferred to this court for further proceedings.
On or about July 1, 1985, this court ordered Conoco and the other Texas plaintiffs to transfer the incremental stripper monies from the various Texas escrow accounts to this court's stripper well escrow account at Bank IV, Wichita, Kansas.
Following the entry of the court's order and judgment approving the Final Settlement Agreement in July 1986, and pursuant to the Final Settlement Agreement, Conoco permitted DOE to audit the stripper properties operated by Conoco to ascertain whether any escrow deficiencies existed. By letter dated December 21, 1987, the DOE advised Conoco of the results of its audit, and of DOE's position that Conoco failed to deposit $4,439,301 in overcharges pertaining to 29 stripper properties operated by Conoco.
On or about March 18, 1988, Conoco responded to the DOE's letter of December 21, 1987, and put the DOE on notice that approximately 80% of the alleged escrow deficiency was attributable to oil taken in kind by third-party interest owners:
The individual property folders [enclosed with this letter], except where Conoco held all basic division orders, provide the names and percentages of ownership of third parties in these properties, which are almost all unitized operations. The relevance of this information pertains to the issue comprising practically the entire DOE claim, being the barrels of oil and associated severance taxes which were taken "in kind" by these third-party interest owners. Conoco never certified, sold or received any revenues regarding these barrels. Nor is Conoco knowledgeable regarding the tier certifications or prices received by the owners of this crude oil.
Several unit agreements are included in the material which are instructive as to the rights of interest owners to obtain their interest in production by taking their oil "in kind", as well as to dispose of such oil different than and apart from the operator's interest in the common production. A comparison of the statement of pipeline runs to the MDL Statement of Amounts Escrowed furnished for each property by month, evidence that Conoco certified only the division of interests held for these properties or for production purchased therefrom. Thus, that sum, including severance taxes, was deposited with the Court's escrow account, with minor variations indicated on the Recap.
*1170 On August 7, 1989, Conoco made a supplemental deposit of $2,496,524 into the escrow account at Bank IV, Wichita, Kansas, and filed a "Notice of Supplemental Deposit into Escrow Account by Conoco, Inc." which identified the properties involved and the amounts being deposited or credited for each identified property.
On August 3, 1990, Conoco filed an "Amended Notice of Supplemental Deposit into Escrow Account by Conoco Inc." Attached to this document was an affidavit of Gary Brown, explaining why the document was being filed and the basis for various adjustments and corrections to Conoco's deposits which were being made at the time. The Amended Notice and Brown's affidavit reflected Conoco's belief that it had overpaid the escrow account and was entitled to a net credit of $113,483.
On December 31, 1992, Conoco filed a "Notice of Final Deposit into Escrow Account by Conoco Inc." This notice was accompanied by a payment into this court's escrow account in the amount of $1,157,038.15. Conoco asserts that this payment represented the payment in full of all its liability.
Conoco has identified eight properties for which questions remain as to its liability for oil taken "in kind": Eumont Hardy, North East Hennessey, North West Hewitt, Plum Bush Creek, North East Cherokee, North West Adell, O'Brien Strawn, and North West Velma Hoxbar. Conoco was the sole operator and the largest interest owner as to each of these properties. The court shall address each of these properties in turn.
A. Eumont Hardy, Lea County, New Mexico: This unit was certified as a stripper property by including injection wells in the well count from January 1978 through August 1978. Conoco made escrow deposits based on 95.5923% of the working interest. Third parties owned 4.40477% of the working interest. Conoco asserts that, as to these in-kind third parties, it does not know what these third parties did with their share of the oil; to which purchaser they sold their oil; whether any of them certified their share of such oil as stripper exempt; whether any of them received stripper well prices on their shares; or what price any of them received for their share of oil.
DOE has responded that Conoco certified this property as stripper to Shell, the purchaser of the oil produced from the property. The 4.40477% working interest on this property that is alleged to have been taken in kind was a royalty interest owned by the State of New Mexico. The State of New Mexico was unable to locate any records showing that it took the oil in kind. Doc. 2131, Exh. 10. Shell did not purchase the State of New Mexico's in kind barrels. Doc. 2131, Exh. 11. DOE has conceded in its reply brief (Doc. 2152, at p. 12, n. 8) that the 4.40477% was taken in kind.
Neither DOE nor Conoco has been able to produce evidence from the purchaser or interest owner as to the price charged for the oil taken in kind from this property. The evidence does establish that Conoco received stripper prices for 95.6% of the oil produced from this property. DOE asserts that there is no basis for concluding that stripper prices were not paid for the remaining 4.4%. DOE concludes that it is reasonable to infer that overcharges occurred on the 4.4% of the oil on the Eumont Hardy property for which Conoco did not hold the division order.
Except for New Mexico's interest, all of this unit's production has been accounted for. There is no evidence regarding what happened to New Mexico's 4.4% interest. The court cannot determine who purchased it and what price was paid. The court cannot accept DOE's conclusion that the stripper price was paid on New Mexico's 4.4% interest. As to this property, the DOE has failed to meet its burden of proving that overcharges occurred.
B. North East Hennessey, Kingfisher County, Oklahoma: This unit was certified as a stripper property by including injection wells in the well count from January 1978 through August 1978. Conoco made escrow deposits based on 77.42593% of the working interest. In kind third parties own 22.574% of the working interest. Conoco asserts that, as to these in kind takers, third parties owning 4.63087% of the working interest sold their oil at non-stripper prices. As to the in kind third parties owning the remaining *1171 17.94320% of the working interest, Conoco asserts that it does not know what these third parties did with their share of the oil; to which purchaser they sold their oil; whether any of them certified their share of such oil as stripper exempt; whether any of them received stripper well prices on their share; or what price any of them received for their share.
In response, DOE has stated that it does not claim overcharges for any of the oil that Conoco alleges was taken in kind. Overcharges occurred only for the oil which Conoco sold to itself (i.e., to Conoco's refining division). This property is no longer at issue.
C. North West Hewitt, Carter County, Oklahoma: This unit was certified as a stripper property by including injection wells in the well count from January 1978 through November 1979. Conoco made escrow deposits based on 72.710519% of the working interest. In kind third parties own 27.89481% of the working interest. As to these parties, Conoco asserts that it does not know what these third parties did with their share of the oil; to which purchaser they sold their oil; whether any of them certified their share of such oil as stripper exempt; whether any of them received stripper well prices on their share; or what price any of them received for their share.
In response, DOE asserts as follows. Conoco certified this property as stripper to Cities Service Company, the purchaser of the oil produced from the property. The 27.289481% of the working interest on this property that is alleged to have been taken in kind was owned by 26 working interest owners. DOE has conceded in its reply brief (Doc. 2152, at p. 12, n. 8) that the 27.289481% was taken in kind. Cities paid unlawful stripper prices for all of the oil. Doc. 2153, Exh. 18 (letter from Conoco to Cities, stating that Conoco's records indicate that Cities was the purchaser of the oil for which Conoco did not hold the division order); Doc. 2131, Exh. 15 (documentation from Cities that it purchased all the production from the property and paid stripper prices).
The documentary evidence before the court shows no genuine issue of fact regarding Cities' purchase of crude oil from this property at stripper prices.
D. Plum Bush Creek, Washington County, Colorado: This unit was certified as a stripper property by including injection wells in the well count from January 1978 through March 1980. Conoco made escrow deposits based on 40.375% of the working interest. In kind third parties own 59.625% of the working interest. Conoco asserts that owners of 28.25% of the working interest sold their oil at non-stripper prices. Conoco asserts that it has no first hand knowledge regarding whether owners of the remaining 31.375% either certified their oil as stripper or sold it at stripper prices.
DOE has responded that a portion of the oil produced from this property (28.25%) was sold at lawful prices. Doc. 2131, Exh. 16 (letter from Amoco to Conoco indicating volume and price for Amoco's 28.25% in kind share). Unlawful stripper prices were paid with respect to the remainder. The 31.375% of the working interest on this property that is alleged to have been taken in kind and that was sold at unlawful prices was owned by seven working interest owners. Unocal Corporation and ARCO Oil and Gas Company paid stripper prices with respect to the remaining 31.375% in kind working interests on the property. Doc. 2131, Exh. 17 and 18.
The documentary evidence before the court shows no genuine issue of fact regarding the sales of crude oil from this property at stripper prices as asserted by DOE.
E. North East Cherokee, Alfalfa County, Oklahoma: This unit was certified as a stripper property by including injection wells in the well count from May 1980 through January 1981. Conoco made escrow deposits based on 37.68129% of the working interest. In kind third parties own 62.31871% of the working interest. A portion of this oil was purchased by Sun Oil Company (now Oryx Energy, Inc.) at stripper prices. As to the remaining working interest, Conoco asserts that it has no first hand knowledge regarding whether these third party owners either certified their oil as stripper or sold it at stripper prices.
*1172 DOE has responded that Conoco certified this property as stripper to Sun Oil Company. Sun purchased all of the oil produced from the property (Affidavit of John D. West, Doc. 2151), and Sun paid unlawful stripper prices with respect to all of the working interests. Doc. 2131, Exh. 19, 20, 21. The 62.31871% of the working interest on this property that is alleged to have been taken in kind was owned by 39 working interest owners.
The documentary evidence before the court shows no genuine issue of fact regarding the sales of crude oil from this property at stripper prices as asserted by DOE.
The impact of DOE's settlement with Phillips, the owner of 12.79% of the working interest, shall be addressed later in this opinion.
F. North West Adell, Decatur County, Kansas: This unit was certified as a stripper property by including injection wells in the well count from February 1979 through January 1981. Conoco made escrow deposits based on 91.95395% of the working interest. In kind third parties own 8.058% of the working interest. Conoco asserts that it has no first hand knowledge regarding whether these owners either certified their oil as stripper or sold it at stripper prices.
DOE responds that Conoco certified this property as stripper to Mobil Oil Corporation, Mobil purchased all of the oil produced from the property, and Mobil paid unlawful stripper prices with respect to all of the working interests. Doc. 2131, Exh. 22, Doc. 2153, Exh. 38. The 8.058% of the working interest on this property that is alleged to have been taken in kind was owned by two working interest owners.
The DOE concedes that there is a four month gap in the evidence it has offered. Mobil's data does not cover the first four months of the overcharge period, February through May 1979. However, it is appropriate to infer that Mobil paid the stripper price for the 8.058% working interest during those four months, given the undisputed evidence that Mobil paid Conoco the stripper price for the 91.95395% working interest during the entire period (including the four months for which documentation is missing) and that Mobil purchased the additional 8.058% of the working interest during that same time period.
G. O'Brien Strawn, Haskell County, Texas: This unit was certified as a stripper property by including injection wells in the well count from January 1978 through March 1979. Conoco made escrow deposits based on 84.71861% of the working interest. In kind third parties own 15.28139% of the working interest. Conoco asserts that it has no first hand knowledge regarding whether these owners either certified their oil as stripper or sold it at stripper prices.
DOE responds that Conoco certified this property as stripper to Koch Oil Company, and Koch purchased all of the oil produced from the property at unlawful stripper prices. Doc. 2131, Exh. 24, Doc. 2153, Exh. 40. The 15.28139% of the working interest on this property that is alleged to have been taken in kind was owned by one working interest owner.
The DOE concedes that there is a three month gap in its evidence. Documents provided by Koch cover the period of January 1978 through December 1978. Koch's data does not cover the final three months of the overcharge period on this property, January through March 1979. It is appropriate to conclude based on the evidence before the court that overcharges occurred on 100% of the oil produced. Conoco received stripper prices from Koch for the entire period. Having paid stripper prices to Conoco throughout the period of overcharges, and to the other interest owner prior to January 1979, it is unlikely that Koch would have paid the other interest owner the controlled price for the period January through March 1979.
The impact of DOE's two consent orders with Getty, the 15.28% working interest owner, shall be addressed later in this opinion.
H. North West Velma Hoxbar, Stephens County, Oklahoma: This unit was certified as a stripper property by including injection wells in the well count from January 1978 through January 1981. Conoco made escrow deposits based on 52.32674% of the working interest. In kind third parties own *1173 47.67326% of the working interest. Conoco asserts that it has no first hand knowledge regarding whether these owners either certified their oil as stripper or sold it at stripper prices.
DOE responds that Conoco certified this property as stripper to Mobil Oil Corporation, Mobil purchased all of the oil produced from the property, and Mobil paid unlawful stripper prices with respect to all of the working interests. Doc. 2131, Exh. 26, Doc. 2153, Exh. 41. The 47.67326% of the working interest on this property that is alleged to have been taken in kind was owned by five working interest owners.
Data provided by Mobil to Conoco covering June 1979 through January 1981 indicates that Mobil paid stripper prices for all of the oil produced from this unit. Mobil's data does not cover the first seventeen months of the overcharge period, January 1978 through May 1979. It is undisputed that Conoco received stripper prices from Mobil for the entire period. Texaco, Inc., the second largest interest owner on this property and the largest in kind interest owner, deposited overcharges for this property for the entire period that overcharges occurred on this property, demonstrating that it had received stripper prices for the entire period. It is appropriate to infer that the stripper price was paid for all of the oil produced from this unit for the entire overcharge period.
The impact of DOE's settlements with working interest owners Phillips, Texaco and Getty shall be addressed later in this opinion.
The following additional facts, as set forth by DOE, appear to be uncontroverted.
Conoco operated 28 properties that it had certified as stripper well properties based on the inclusion of injection wells in the well count and on which overcharges occurred.
Generally each owner of an interest on an oil producing property executes a "division order" under which the owner of such interest agrees on general terms for the sale of oil attributable to that interest.[1] For 10 of the properties involved in this case, Conoco held the division orders for some but not all of the interests. Each time Conoco certified one of these properties as stripper based on inclusion of injection wells in the well count, it notified every working interest owner on the property of its action. The notices sent to the interest owners for which it did not hold division orders included the following language (except for appropriate changes in the dates);
Continental [Conoco] is now pursuing its own case against the D.O.E. ... challenging the validity of Ruling 1974-29.... Concurrent with and subsequent to the filing of the suit, Continental is certifying all Continental-operated properties qualifying for stripper well exemption based on an average daily production calculation which includes injection wells in the well count.
The above-captioned property was certified in this manner effective January 1, 1978.... Thus, your purchaser's settlements on this property will be based on stripper prices commencing with oil sales made in January, 1978. However, should the Court's decision be adverse and require refunds to purchasers by or on behalf of Continental, we will need to recover either in cash or from future production any excess amounts that may have been paid to you as a result of the stripper prices, including your proportionate share of any interest ordered by the Court. Therefore, Continental recommends that the additional monies derived from the "injection well certifications" be suspensed until current litigation is resolved.
Doc. 2130, Exh. B (emphasis added).
Conoco sent similar letters to royalty and working interest owners for which it did hold division orders. The key difference is contained in the following paragraph:
The above-captioned property was certified in this manner effective January 1, 1978, 1978.... The additional revenue resulting from the stripper certification will be suspensed until final resolution of our *1174 litigation with D.O.E., at which time we will either book the suspensed monies or, should the Court's decision be adverse, make the necessary refunds to purchasers. Thus, until such time, Continental's settlements with you on the referenced property will continue to be based on the otherwise applicable ceiling prices.
Doc. 2143, Exh. 1 (emphasis added).
During each month of the period from March 1978[2] through the end of January 1981, overcharges occurred on one or more of the 28 Conoco-operated properties involved in this matter. The total amount of these overcharges (including oil owned both by Conoco and by other interest owners) was $26,999,482, according to DOE's calculations.
Deposits into the escrow account for these overcharges commenced in December 1978. Interest had already accrued on overcharges prior to that time. DOE's calculations do not include interest on any overcharges that were deposited into escrow at any time during the month following the month in which the overcharges occurred.
The amounts deposited for the overcharges were less than the amounts of overcharges outstanding at the time of each deposit. Additional interest accrued during the remainder of the overcharge period on these unpaid overcharge amounts.
As of April 1981, the escrow deposits for overcharges totalled $23,743,858 and the unpaid overcharges totalled approximately $3,255,625. The total amount of escrow deposits for the properties at issue here was $29,803,290. Doc. 2153, Exh. 4, 7.
Subsequent to April 1981, interest has continued to accrue on unpaid amounts that have remained outstanding. Escrow deposits were made during the months of July 1981, October 1983, August 1989, March 1990, and December 1992, and each was sufficient to pay only a portion of the total amount outstanding at the time of the payment.
Using the interest rates set forth in DOE's Policy Statement on Interest, 46 Fed.Reg. 21,412 (1981), and, for the period subsequent to January 1983, the United States Rule that deposits are applied first to interest, and the revisions made by DOE in its amended motion for summary judgment (Doc. 2150), Conoco's remaining liability (with interest as of September 30, 1993) totals $8,635,074, according to DOE's calculations.

Discussion
Conoco argues that DOE bears the burden of proving that overcharges did in fact occur; that the operator liability doctrine does not vary the DOE's burden of proof; and that the DOE has not met its burden of proof with respect to the third-party working and royalty interest owners who took their share of production in kind. Conoco asserts that the evidence DOE has submitted is insufficient to sustain that burden of proof, because it is inadmissible hearsay. Conoco further argues that DOE's settlements with three working interest owners bar recovery of a portion of the claimed overcharges.

Burden of proof and evidentiary issues
The court first turns to whether DOE has met its burden of proving that the overcharges included in its claim against Conoco have occurred. The DOE assumes that it bears the burden of proving that overcharges occurred. The court sees no need to address this issue further.
DOE argues that it has proven that the overcharges it alleges have occurred. DOE states that the evidence relied upon is of the same type which the court has found to be sufficient in previous proceedings and which the DOE has relied upon in previous audits. DOE has submitted the documentation it relied upon in concluding that the overcharges had occurred. DOE asserts that some of the documents are admissible as business records under Fed.R.Evid. 803(6); that most of the documents about which Conoco complains were provided by Conoco; *1175 and that the remaining documents fit within the generic exception to the hearsay rule, Fed.R.Evid. 803(24).
The parties are familiar with the requirements of Rule 803(6). The documents which DOE asserts are admissible as business records include Sun's crude oil ticket listings for the North East Cherokee property, Cities' crude oil run statements for the North West Hewitt property, and Koch Industries' statements of crude oil purchases from the O'Brien Strawn property. Doc. 2131, Exh. 15, 20, 24. With respect to the Sun documents, the affidavit of John D. West establishes their admissibility under the business records exception. Doc. 2151. The contents of the Cities and Koch documents as well as the other matters of record are sufficient to establish their status as business records kept in the course of regularly conducted business activity. The failure to call a records custodian from the entities that generated these documents is not determinative of their admissibility under Rule 803(6). The court finds that the record as a whole establishes a sufficient foundation for admission of the records under Rule 803(6). See United States v. Johnson, 971 F.2d 562, 572 (10th Cir.1992).
DOE argues that other documents  data compilations and correspondence  are admissible under the residual hearsay exception, Fed.R.Evid. 803(24). DOE discusses in particular four sets of data compilations which were provided to Conoco: from Unocal regarding the Plum Bush Creek Unit, Doc. 2131, Exh. 17; from ARCO regarding the Plum Bush Creek Unit, Doc. 2131, Exh. 18; and two from Mobil  one regarding the North West Adell Unit, Doc. 2131, Exh. 22 and one regarding the North West Velma Hoxbar Unit, Doc. 2131, Exh. 26.
Rule 803(24) excepts from the hearsay rule any statement "not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness," provided that the following elements are met: (1) the statement is offered as evidence of a material fact; (2) the statement is more probative than any other evidence which can reasonably be procured; (3) the interests of justice would be served by admission of the statement; and (4) advance notice of the intent to use the statement has been given to the other side. Fed.R.Evid. 803(24). The documents proffered by DOE fit squarely within the requirements of the rule. These documents are offered to prove a material fact, i.e., that the oil for which Conoco did not hold division orders was sold at stripper prices. Conoco has been provided sufficient notice of DOE's intent to use these documents. The documents are more probative than any other evidence available through reasonable efforts. To obtain equivalent information, DOE would have had to take discovery from several oil companies and the 75 owners of the interests for which Conoco did not hold the division orders. The burden of obtaining equivalent information would be great.
The court finds that these documents have sufficient circumstantial guarantees of trustworthiness. The purchasers of crude oil from Conoco-operated properties have no stake in the outcome of this case and thus would have no reason to falsify the information. As further evidence of trustworthiness, Conoco itself has relied and acted upon some of these documents and documents of the same type.
Conoco relied upon Unocal's documentation as identifying the seller and the prices paid for certain production from the Plum Bush Creek Unit. The data compilation that Conoco received from Unocal identified Kimbark Operating Company as the seller. On the basis of this material, Conoco demanded that Kimbark pay Conoco the escrow deficiency attributable to Kimbark's production. Doc. 2153, Exh. 31.
Conoco received documentation from Amoco regarding the Plum Bush Creek property which was similar to the documentation received from Unocal, except that it demonstrated that lawful prices were charged on Amoco's share of production. Doc. 2131, Exh. 16. Conoco thanked Amoco for its response, and stated, "This information should be satisfactory to the DOE, ..." Doc. 2153, Exh. 30. Conoco relies upon the Amoco documents as proof that no overcharges occurred on Amoco's share of production. *1176 DOE also relies upon these same Amoco documents and has found them sufficient proof that no overcharges occurred on Amoco's share of production.
Conoco has also relied on similar "hearsay" documents from Champlin and Exxon as proof that overcharges did not occur. Doc. 2104, App. 1, Exh. B, Exh. 4 to Affidavit of Gary Brown; Doc. 2131, Exh. 12. Again, DOE has concluded based on these documents that overcharges had not occurred.
From the court's examination of the briefs and exhibits, it appears that Conoco is relying on some hearsay documents which are favorable to its position while objecting to the use of hearsay documents that are favorable to DOE. Certain of these hearsay documents were generated or produced in response to Conoco's requests for information from various purchasers of crude oil from Conoco operated properties. Conoco requested the information by sending similarly worded requests to a variety of entities. Having requested the information, and having chosen to rely upon the favorable responses, Conoco should in all fairness be bound by the unfavorable responses.
The court shall not burden this opinion any further with a discussion on the hearsay rule and its exceptions. The key issue before the court is the trustworthiness of the proffered evidence. The evidence proffered by DOE is the type of evidence it relies on in performing its audits of oil companies. It is the type of evidence that the DOE has relied on in previous summary judgment motions in this case. It is the type of evidence previously relied upon by this court in ruling on those summary judgment motions. It is evidence which is readily available. Unlike the memories of witnesses, such documentary evidence does not fade with time. And, perhaps most importantly, it is the type of evidence which Conoco itself relies on when favorable to Conoco. Conoco cannot be heard to complain about the use of this evidence in the present proceedings. The court finds that the interests of justice would be served by the admission of this evidence.
The court next turns to the issue of the admitted gaps in the documentary evidence. The court shall first address the North West Adell, O'Brien Strawn and North West Velma Hoxbar properties. These properties all involved a single purchaser. As discussed above in the statement of facts, the evidence proffered by DOE demonstrates that the purchaser paid stripper prices for a substantial portion of the oil. The court finds that it is appropriate to infer, in the absence of evidence to the contrary, that the remaining oil was sold at the stripper price.
The court does not arrive at the same conclusion regarding the Eumont Hardy property. The State of New Mexico owned a 4.4% royalty interest in the Eumont Hardy property. There is no evidence before the court regarding who purchased that oil or what price was paid for that oil. Thus, the court cannot accept DOE's conclusion that the stripper price was paid.

Restitution standards and operator liability
The Temporary Emergency Court of Appeals (TECA)[3] has stated in several cases that restitution is a remedy by which the defendant is made to disgorge illgotten gains, or to restore the status quo, or to accomplish both objectives. Kern Oil & Refining Co. v. Tenneco Oil Co., 868 F.2d 1279, 1282 (TECA 1989); United States v. Exxon Corp., 773 F.2d 1240, 1278 (TECA 1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); Sauder v. Department of Energy, 648 F.2d 1341, 1348 (TECA 1981). It is not necessary that there be both unjust enrichment and injury to third parties before restitution may be ordered. United States v. Sutton, 795 F.2d 1040, 1061 (TECA 1986), cert. denied, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987). Thus, it is not necessary to find that the infringer actually received or benefitted *1177 from the overcharges before ordering restitution. Citronelle-Mobile Gathering, Inc. v. Herrington, 826 F.2d 16, 27 (TECA), cert. denied sub nom. Chamberlain v. United States, 484 U.S. 943, 108 S.Ct. 327, 98 L.Ed.2d 355 (1987); Sauder, 648 F.2d at 1348.
The parties agree that Conoco can be held liable only through the application of the operator liability doctrine. Under the operator liability doctrine, DOE may hold the operator of a crude oil producing property liable for overcharges attributable to other interest owners on that property. Case law from the Temporary Emergency Court of Appeals supports the application of this theory of liability. See United States v. Exxon Corp., 773 F.2d 1240 (TECA 1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); Sauder v. Department of Energy, 648 F.2d 1341 (TECA 1981). This court has previously applied the operator liability doctrine in this case. In re: Department of Energy Stripper Well Exemption Litigation (Mobil v. DOE), 739 F.Supp. 1446 (D.Kan.1990); In re: Department of Energy Stripper Well Exemption Litigation (Chevron v. DOE), 746 F.Supp. 1452 (D.Kan.1990), rev'd in part on other grounds, 944 F.2d 914 (TECA 1991).
Under the operator liability doctrine, the DOE may hold the operator of a crude oil producing property liable for the entire amount of overcharges which occurred, even though the operator may have received only a portion of the overcharges corresponding to its percentage ownership interest in the property. Operator liability has been imposed in at least two general situations: when the operator is the animating force responsible for the overcharges, or when the operator is held liable as a matter of administrative convenience. See Sauder, 648 F.2d at 1347-48 (sole operator certified the leases as stripper well leases and caused the overcharges); United States v. Exxon Corp., 561 F.Supp. 816, 850 (D.D.C.1983), aff'd 773 F.2d 1240, 1270 (TECA 1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986) (requiring DOE to proceed against over 200 working interest owners and over 2200 royalty interest owners would plunge DOE into an "administrative quagmire"). Imposition of operator liability is discretionary. See Sauder, 648 F.2d at 1347-48.
The courts have stated, however, that the operator "is not without recourse against the other interest owners, ..." Exxon, 561 F.Supp. at 850. Following imposition of liability on the operator, the operator has the burden of pursuing each individual working interest and royalty interest owner to recover the overcharges which that interest owner received. Sauder, 648 F.2d at 1348. Imposition of liability on the operator does not depend on a finding that the operator is entitled to contribution for the overcharges from the other interest owners in the property. Exxon, 773 F.2d at 1272.
A government enforcement action is not the appropriate vehicle for the determination of the operator's rights against third parties. Exxon, 773 F.2d at 1272. Thus, during the overcharge proceedings, the court does not determine the nature or extent of the operator's right to contribution or indemnity, if any. Nor does the court adjudicate the rights or liabilities of absent interest owners. See id. at 1271.
DOE need not seek restitution from each individual working interest owner. See Sauder, 648 F.2d at 1347-48. Nor does the government need to prove that an attempt by the operator to recover from the interest owners would be successful. Exxon, 773 F.2d at 1272.
It is undisputed that Conoco did not sell all the stripper well oil at issue and that Conoco did not receive all the overcharges. Conoco argues that it should not be held liable because it was not the animating force behind the deficiencies to the escrow. Conoco additionally contends that administrative convenience to DOE should not prevail.
The court finds that the present case is one in which operator liability is appropriate. Although it is not necessary to find both causation and administrative convenience before imposing operator liability, the court finds that both of these alternatives have been met. Conoco was the animating force *1178 behind the overcharges and caused the overcharges to occur. Conoco obtained an injunction from this court permitting it to certify the properties at issue as stripper well properties. Further, pursuing the individual interest owners would place an enormous burden on the DOE.
Conoco argues that this case presents an issue which the court has not "truly addressed" in any prior opinion: whether operator liability may be imposed upon an operator with respect to production taken in kind by other interest owners. Conoco argues that the cases previously decided by this court involved an operator that sold all the oil itself.
Contrary to Conoco's position, both TECA and this court have previously addressed and rejected the arguments presented by Conoco. TECA has addressed the "in kind" issue and has resolved it against the operator. In Exxon, TECA specifically affirmed the district court's ruling that Exxon was liable for the share of production owned, taken in kind, and sold by Texaco, Exxon, 773 F.2d at 1272-73. Thus, Exxon was held liable for overcharges that it did not actually receive. Further, TECA's decision in Sauder specifies that an operator may be held liable for overcharges that it did not actually receive. 648 F.2d at 1347-49.
Contrary to Conoco's assertion, this court's Mobil decision did not involve an operator that sold all the oil itself. The court imposed liability on Mobil as operator even though Mobil had not sold all the oil or collected all the overcharges. Conoco is technically correct in stating that this court's summary judgment opinion in the Mobil case did not address operator liability with respect to oil taken in kind. However, the court did resolve that issue in ruling on Mobil's motion for reconsideration. The court corrected a factual misstatement from its earlier opinion and recognized that Mobil had not sold all of the oil it had miscertified as stripper. The court then held Mobil liable as operator for the overcharges because Mobil had decided to certify the oil as stripper and had obtained injunctive relief permitting the stripper certifications, and because pursuit of the interest owners would place an enormous burden on the DOE. In re: Department of Energy Stripper Well Exemption Litigation (Mobil Oil Corp. v. DOE), 739 F.Supp. 1446, 1447-48 (D.Kan.1990).
In the present case, Conoco did not sell all of the oil at issue. The in kind oil was sold by other interest owners. Conoco did not receive or handle the money for the sale of that oil. In this regard, the present case does not differ from the Mobil case. Even though Conoco did not sell all the oil at issue, it can be held liable for all the overcharges. The fact that Conoco received none of the overcharges attributable to interest owners for whom it did not hold division orders is not a barrier to recovery by DOE.
Like the Mobil case, Conoco brought suit and obtained an injunction to permit it to certify the properties at issue as stripper. The injunction does not excuse Conoco from liability. Absent the benefit of the court's injunction, these properties would not have qualified for the stripper well exemption from price controls. Without the injunction, Conoco could not have certified the property as stripper. No overcharges could have occurred absent the stripper certifications issued by Conoco. Rather than excusing the operator, the injunction demonstrates that the operator is responsible for the overcharges. The overcharges at issue would not have occurred otherwise. Mobil, 739 F.Supp. at 1448. Conoco's asserted good faith is not a defense.
Conoco understood that the injunction it obtained and the stripper certifications it issued in reliance on the injunction would result in the payment of stripper prices by the purchasers. The letters sent by Conoco to the in kind interest owners (Doc. 2130, Exh. B) indicate that Conoco anticipated that the in kind interest owners would receive the stripper price based on Conoco's certification. The letters also indicated that restitution might be in order if the final decision in the case was in favor of DOE. If so, Conoco cautioned the interest owners that it would seek to recover the overcharges from them. Conoco clearly anticipated the possibility that it would have to pursue the interest owners for the overcharges which Conoco itself did not receive and escrow.
*1179 Conoco argues that the other interest owners were required to and did issue their own stripper well certifications to their immediate purchasers. Putting aside the legal issue of whether such certifications were required, Conoco's factual assertion is speculation at best. Conoco has proffered no evidence to support its assertion that any of the other interest owners did in fact issue such certifications. Conoco has provided the court with no such certifications. The court must conclude that no such certifications were issued by the other interest owners.
Finally, the court finds that administrative convenience would be served by imposing operator liability on Conoco. To require the DOE to pursue the 75 individual interest owners would place an enormous burden on the DOE.
Conoco has the possibility of recourse against the interest owners. As noted above, imposition of liability on the operator does not depend on whether the operator has already recovered from the interest owners or will be able to recover from the interest owners. Nor is the court required to inquire about the financial solvency of the interest owners before imposing liability on the operator. The operator liability doctrine places the risk upon the operator, and not the DOE, to pursue any claims against the interest owners who received the overcharges.
Before concluding this discussion of operator liability, the court must address one final issue raised by Conoco regarding causation. Conoco has argued that it did not cause the working interest owners to charge the stripper price and that it cannot therefore be held liable for the interest owners' independent pricing decisions. Conoco has submitted certain materials dealing specifically with Phillips' working interest in the North East Cherokee and North West Velma Hoxbar properties. Phillips' counsel M.C. Cunningham II has submitted an affidavit, Doc. 2187. In it, he states that after this court's ruling in January 1978 in the Energy Reserves Group case, Phillips decided to count injection wells in determining the applicability of the stripper well exemption. Doc. 2187, ¶ 6. Cunningham states that in February or March 1978, Phillips began to review its secondary recovery properties which it operated or in which it held a working interest to identify those that would qualify as stripper properties with the inclusion of injection wells. Phillips thereafter made a corporate decision to count injection wells in making stripper certifications. Id. ¶ 7. Cunningham asserts that Phillips relied on the Energy Reserves Group decision. Id. ¶ 8.
On April 7, 1978, Phillips filed suit in this court. Id. ¶ 9. Phillips' complaint alleged that Phillips was the operator of or had a working interest in 22 properties which would be entitled to the stripper well lease exemption if injection wells were included in the well count. Doc. 2187, Exh. A, ¶ 24. On April 21, 1978 a hearing was held on Phillips' motion for a preliminary injunction. The exhibits presented at the preliminary injunction hearing list North West Velma Hoxbar, operated by Conoco, as one of the affected properties. Id., Exh. C. The injunction (drafted by counsel for Phillips) included both Phillips-operated properties and properties in which Phillips owned a working interest. Doc. 2187, Exh. D.
Cunningham asserts that Phillips' decision to charge stripper prices was not based on Conoco's stripper property certification for the North West Velma Hoxbar property or the letter from Conoco dated June 14, 1978. Cunningham states that Phillips' decision was an independent judgment made by Phillips' management establishing a general policy for pricing all of Phillips' affected properties. Cunningham asserts that the primary impetus in this decision was the January 1978 decision of this court in the Energy Reserves Group case. Id. ¶ 23. While Cunningham's affidavit denies any reliance by Phillips on Conoco's stripper certification, there is nothing in the record to indicate how Phillips might have determined as a factual matter that the properties Conoco operated would have qualified for the stripper well exemption, i.e., that the average daily production did not exceed ten barrels per well over the previous twelve month period.
As noted above, Conoco has argued that the in kind interest owners must separately certify their oil as stripper. Generally, the operator has the information necessary to *1180 determine the average daily production per well for the twelve month stripper qualification period. Second Wesner Declaration, Doc. 2153, ¶ 14(b). This information is not generally available to the non-operating interest owners.
Conoco's certifications appeared to apply to entire properties. There is nothing on the face of Conoco's certifications to indicate that these certifications applied to less than the entire properties. Conoco's letters to the interest owners for which Conoco did not hold division orders (including Phillips) stated that these interest owners would receive stripper prices. Doc. 2130, Exh. B. This confirms that the certifications covered all interests in a property, and not just those for which Conoco held the division orders.
There is no evidence that Phillips actually issued its own stripper certifications to the purchasers of its working interests in the North West Velma Hoxbar or North East Cherokee properties. Cunningham's affidavit (Doc. 2187 ¶ 11) and Phillips' memorandum in support of motion for preliminary injunction (Id. Exh. B) assert that the properties in which Phillips had interests had been recertified as stripper well properties. These documents do not state that Phillips recertified these properties. Phillips has provided the court with no certifications for North West Velma Hoxbar or North East Cherokee. In fact, Phillips has provided the court with no certifications of any of the properties in which it held working interests. The court must conclude that Phillips did not itself recertify as stripper the properties in which it owned a working interest but which it did not operate.
Phillips' general corporate policy regarding the counting of injection wells did not cause the overcharges. Before charging the stripper price, either Conoco or Phillips had to determine which properties would qualify as stripper with the inclusion of injection wells. This determination required production data from the previous twelve months. Conoco possessed this information as operator. There is no indication that Phillips possessed this information. Conoco obtained an injunction and certified the properties at issue as stripper. There is no evidence in the record to indicate that Phillips certified the properties which it did not operate. Conoco's stripper well certifications caused the overcharges to occur.

Impact of DOE's settlements with Phillips, Texaco, Getty
Phillips Petroleum Company owned working interests on the North East Cherokee and North West Velma Hoxbar properties for which Conoco did not hold the division orders. Texaco, Inc. owned a working interest on the North West Velma Hoxbar property for which Conoco did not hold the division order. Getty Oil Company owned working interests on the O'Brien Strawn and North West Velma Hoxbar properties for which Conoco did not hold the division orders. Overcharges attributable to these interests are included within DOE's calculations of Conoco's liability.
Conoco argues that DOE is barred as a matter of law from recovering any overcharges attributable to the in kind working interests of Phillips, Texaco, and Getty because of prior settlements with those companies covering the properties at issue here. Conoco argues that DOE released Phillips, Texaco, and Getty from any further liability for stripper overcharges in their capacity as working interest owners. Conoco argues that no liability may be imposed on it as the operator when the underlying interest owner has been released.
DOE argues that it has given Conoco full credit for escrow deposits and refunds of overcharges by interest owners on Conoco-operated properties, and that the settlements between DOE and the interest owners do not warrant any further reduction in the amount of Conoco's liability. DOE's calculations have given Conoco full credit for amounts paid into the escrow for overcharges attributable to Texaco and Phillips. Getty made no payments for any of the properties at issue.
After considering the language of the various consent orders and the agreed judgment, the court agrees with DOE's position. The settlements absolved Phillips and Texaco from any further liability to DOE. However, that does not resolve the issue of whether Conoco may be held liable for overcharges *1181 attributable to those working interests for which restitution has not yet been made. The settlements with Phillips, Texaco and Getty do not address the liability of Conoco to DOE for Conoco operated properties. Nor do the settlements affect whether, or to what extent, Conoco may recover from Phillips or Texaco via contribution or indemnity for any overcharges Conoco must pay on account of the working interests of Phillips, Texaco and Getty.

Phillips consent order
Conoco argues that, as to Phillips' working interests on the North East Cherokee and North West Velma Hoxbar properties, DOE released its right to recover any portion of those overcharges by virtue of a Consent Order dated November 9, 1979 between DOE and Phillips. Pursuant to this Consent Order, Phillips refunded to its first purchaser Sun the sum of $219,659.03 (via a recoupment exercised by Sun) in June 1984 for overcharges on North East Cherokee. On March 16, 1987, Phillips refunded $235,738.02 to its first purchaser, Mobil, for overcharges on North West Velma Hoxbar.
In its computation of Conoco's liability, DOE has given Conoco credit for both of these refunds by Phillips. DOE has given credit to Conoco for Phillips' refund to Mobil in March 1987 in the amount of $235,738.02 for overcharges on the North West Velma Hoxbar property. DOE has credited that amount to Conoco's liability as of March 1987. Second Wesner Declaration, Doc. 2153, ¶ 13(h)(2).
DOE has given credit to Conoco for Sun's deposit of $1.9 million for overcharges attributable to the working interests of five oil companies (including Phillips) in the North East Cherokee property. Included within that amount was the $219,659.03 which Sun recouped from Phillips for overcharges attributable to Phillips' working interest in the North East Cherokee property. Second Wesner Declaration, Doc. 2153, ¶ 13(e)(4).
Conoco argues that paragraph 447(b) of the Consent Order released Phillips from any and all liability for stripper well issues. That paragraph provides:
Phillips and DOE shall stipulate to the dismissal of Phillips' claims against DOE in Robert F. Johnson and Phillips Petroleum Company v. Department of Energy, No. 78-1140 (D.Kansas), and to the return to Phillips of all funds which Phillips has theretofore paid or caused to be paid to the Clerk pursuant to the Court's Order of May 3, 1978, together with all accrued interest thereon. The dismissal shall be with prejudice as to such claims and issues in such case as relate exclusively to the period before November 1, 1979, and without prejudice otherwise. Phillips and DOE agree to be bound by any final determination of Energy Reserves Group, Incorporated v. Department of Energy, No. 77-1146 (D.Kansas), as to whether or not injection wells are counted as wells that produce crude petroleum in determining the eligibility of property for treatment as a stripper-well property. If that question is finally decided adversely to the plaintiffs in that case, Phillips shall (notwithstanding paragraph 448 hereof) promptly refund to each of its crude oil purchasers the difference between the amount the purchaser actually paid Phillips for crude oil sold from and after November 1, 1979 pursuant to any certification of a property as a stripper-well property, and the amount such purchaser would have paid Phillips for such oil had injection wells not been counted as wells that produce crude petroleum in determining the eligibility of the property for treatment as a stripper-well property, together with interest at the rates provided for refunds under the federal petroleum price and allocation requirements.
Doc. 2142, App. A.
Conoco argues that the consent order expressly included any liability Phillips had incurred or might incur as a working interest owner: "References in this Consent Order to Phillips include (without limitation) its officers, directors, employees, subsidiaries, affiliates, and successors in interest, and its petroleum-related activities as refiner, producer, operator, working or royalty interest owner, reseller, natural gas processor, or otherwise." Id. ¶ 301.
*1182 Paragraph 101 of the Phillips Consent Order provides that it "settles all claims and disputes against Phillips by DOE." Doc. 2142, App. A. The Consent Order does not address the resolution of disputes between DOE and Conoco (or DOE and any third party). The fact that this court has previously upheld the refund provisions in the Phillips Consent Order does nothing to prevent DOE from recovering the overcharges that have not been refunded. DOE is not seeking to recover the amounts that have been refunded by Phillips. It is the additional, unrefunded amounts attributable to Phillips which DOE is seeking to recover.

Texaco consent order and agreed judgment
Conoco argues that a Consent Order and Agreed Judgment between Texaco and DOE extinguish any liability attributable to Texaco's interest in the North West Velma Hoxbar property and to Getty's interests in North West Velma Hoxbar and O'Brien Strawn. (Prior to the execution of the settlements, Getty had been acquired by Texaco.) Conoco asserts that in the Texaco Consent Order and Agreed Judgment, DOE agreed not to seek recovery from the operators of properties in which Texaco held a working interest.
After considering the terms of the Consent Order and Agreed Judgment, the court disagrees with Conoco's position. Conoco has argued that the settlements between DOE and Phillips, Texaco and Getty bar DOE from recovering from Conoco any amounts attributable to the interests of those owners on the properties at issue. However, only one of the settlements contains a limitation, and that limitation is not as broad as Conoco asserts. The Agreed Judgment between DOE and Texaco provides that DOE is not permitted to recover from the operator of the North West Velma Hoxbar property (i.e., Conoco) the amounts paid by Texaco for overcharges on that property. Texaco made deposits into the escrow for overcharges on that property. DOE's calculations have given Conoco full credit for the amount of money deposited by Texaco into the escrow. DOE is not attempting to recover the amounts already paid by Texaco.
The Texaco Consent Order contains the following language:
Except as otherwise provided herein, compliance by Texaco with this Consent Order shall be deemed by the DOE to constitute full compliance for administrative and civil purposes with all federal petroleum price and allocation regulations for matters covered by this Consent Order.
Doc. 2142, App. C, Exh. A, ¶ 502(a).
Paragraph 502(b) of the Consent Order provides:
Except for the matters excluded by paragraph 501, this Consent Order settles and finally resolves all aspects of Texaco's liability to the DOE under the federal petroleum price and allocation regulations, including but not limited to its capacity as an operator or working interest or royalty interest owner of a crude oil producing property. In addition, if Texaco was the operator of a property that produced crude oil for all or part of the period covered by this Consent Order, the DOE shall not initiate or prosecute any enforcement action against any person for noncompliance with the federal petroleum price and allocation regulations during such period relative to such property. Otherwise, the DOE reserves the right to initiate and prosecute enforcement actions against any person other than Texaco for noncompliance with the federal petroleum price and allocation regulations, including suits against operators for overcharges for crude oil when Texaco is a working interest or royalty interest owner in such crude oil production. In that connection, Texaco and the DOE agree that the amount paid to the DOE pursuant to this Consent Order is not attributable to Texaco's activities as a working interest or royalty interest owner on properties on which it is not the operator. Furthermore, Texaco and the DOE agree that the Consent Order and the payments hereunder do not resolve, reduce or release the liability of any other person for violations on properties of which (but only for the times during which) Texaco is or was a working interest or royalty interest owner (and not the operator) or affect any rights or obligations *1183 between Texaco and the operator or any other working interest or royalty interest owner.
Id. ¶ 502(b) (emphasis added).
One of the matters addressed in the Consent Order was the present litigation. The parties agreed to execute, and did execute, an Agreed Judgment resolving Texaco's liability in this litigation. The Agreed Judgment was filed in this case on September 16, 1988. The Agreed Judgment provides as follows:
It is further ORDERED that, notwithstanding the terms of this Judgment, the DOE may initiate and prosecute civil and administrative enforcement actions against any party other than Texaco for non-compliance with the federal petroleum price and allocation regulations, including suits for overcharges for crude oil against operators of properties of which Texaco was a working or royalty interest owner of such crude oil production, but in no event shall the DOE be permitted to recover amounts from such operators for alleged overcharges paid by Texaco in connection with the properties described in Exhibit 2 attached hereto, nor shall this Judgment prejudice the rights of Texaco or any third party in any private action, including an action for contribution by or against Texaco; ...
Doc. 2142, App. C, Exh. B, ¶ 3 (emphasis added). Exhibit 2 to that Agreed Judgment listed two properties, North West Velma Hoxbar and a second property not involved here.
As for Texaco operated properties, the DOE agreed not to prosecute any enforcement action against any person for any overcharges. The Consent Order contains no similar provision for non-Texaco operated properties. The Consent Order specifically reserved DOE's right to bring actions against operators for overcharges on oil produced from properties on which Texaco was a working or royalty interest owner. The Agreed Judgment and Consent Order specifically recognize that the DOE was free to pursue operators for overcharges on properties in which Texaco held a working interest.
The limitation contained in the Agreed Judgment provides that "in no event shall the DOE be permitted to recover amounts from such operators for alleged overcharges paid by Texaco" in connection with North West Velma Hoxbar. If the Agreed Judgment provided, for example, that DOE could not recover amounts from such operators for alleged overcharges attributable to Texaco's working interest in the Velma Hoxbar property, the result might be different. However, the Agreed Judgment does not so provide. DOE agreed not to seek recovery for the amounts paid by Texaco. This means the amounts actually paid by Texaco in settlement of the alleged overcharges on the Velma Hoxbar property.
The DOE is not seeking a double recovery. DOE has given full credit to Conoco for Texaco's payments for the Velma Hoxbar property. DOE is not attempting to recover any amounts already paid by Texaco for its working interest. The Consent Order and Agreed Judgment recognize the possibility that DOE would pursue the operators of properties in which Texaco held a working interest (such as Conoco). The last sentence of paragraph 502(b) of the Consent Order (quoted above) specifically provides that it did not affect the liability of any other person for violations on properties on which Texaco was a working interest owner and not the operator.

Getty consent orders
Getty entered into two Consent Orders with DOE. The first was executed in November and December 1979 and covered the period August 19, 1973 through December 31, 1978 (for matters relating to compliance with applicable price and allocation regulations in sales of crude oil) and through September 1, 1979 (for matters pertaining to computation of interaffiliate crude oil prices and pass through of crude oil costs). The second Consent Order covered the time period from January 1, 1973 through January 27, 1981.
Conoco asserts that the first Getty Consent Order specifically provides that Getty's performance under the Consent Order constituted full compliance with the petroleum price regulations:

*1184 Performance under this Consent Order by Getty constitutes full compliance with all statutes and applicable regulations administered by the Cost of Living Council, the Federal Energy Office, the Federal Energy Administration, and the Department of Energy pertaining to the cost, price, and allocation of crude oil, residual fuel oil, NGLs, NGLPs, motor gasoline, and all other refined petroleum products for the period covered by this Consent Order (except as to those matters specifically excluded from this Consent Order as set forth above). DOE will not initiate an administrative or judicial proceeding with respect to Getty for the period covered by this Consent Order or cause any such proceeding to be initiated. DOE will not voluntarily participate in any such proceeding as a party adverse to Getty.
Doc. 2142, App. C, Exh. C, ¶ 8.
The second Consent Order contains a similar provision: "Compliance by Getty with this Consent Order shall be deemed by DOE to constitute full compliance for civil purposes with the Federal petroleum price and allocation regulations, ..." Doc. 2142, App. C, Exh. D, ¶ 501.
Conoco argues that Getty has fully complied with the Consent Orders, that Getty was thus in full compliance with the DOE regulations (including the stripper well regulations) and that, therefore, there are no longer any stripper violations or overcharges attributable to Getty's interests in any properties operated by Conoco.
It appears undisputed that Getty made no payments for any properties involved here. Conoco is seeking to reduce its liability by the unrefunded amounts that are attributable to Getty's interests.
The first Getty Consent Order provides that it "settles all claims and disputes between Getty Oil Company ... and the United States Department of Energy...." Doc. 2142, App. C, Exh. C. The second Getty Consent Order recites that its purpose is to settle "all civil and administrative disputes, claims and causes of action by DOE not resolved by previous Consent Orders, whether or not heretofore asserted, against Getty, ..." Id. Exh. D. Resolution of disputes between DOE and Conoco (or between DOE and any third party) are not addressed in the Consent Orders. Section 502 of the second Consent Order specifies, "This Consent Order resolves only matters between DOE and Getty, ..." Id. There is nothing in these two Consent Orders which resolves Conoco's liability for the overcharges at issue here.

Vicarious liability
Conoco argues that the various settlements bar DOE as a matter of law from recovering from Conoco any overcharges attributable to Texaco's, Getty's and Phillips' working interests. Conoco argues that operator liability is a vicarious liability or derivative liability principle and that DOE's release of the working interest owners also operates to release Conoco. This argument has been rejected by the Temporary Emergency Court of Appeals in United States v. Exxon Corp., 773 F.2d 1240 (TECA 1985). The DOE brought an action for civil penalties and restitution against Exxon, which was the operator of the Hawkins Field Unit, for overcharges occurring on that property. Exxon did not own all of the oil produced from that Unit and did not receive all the overcharges from the sale of that oil. Exxon argued on appeal that it could not be held vicariously liable for portions of the overcharges, because it was acting merely as the agent of other interest owners. 773 F.2d at 1270. TECA rejected Exxon's agency theory of liability. TECA held that Exxon could properly be held solely responsible for the overcharges and that this liability was not dependent on a finding that Exxon was entitled to contribution for such overcharges from other interest owners. Id. at 1272.
TECA's decision in Exxon also addressed the issue of settlements with other interest owners in the Hawkins Field Unit. Exxon had argued that DOE's settlements with various interest owners (such as Mobil, Sun and Conoco) released the claims that DOE had asserted against Exxon as operator. TECA flatly rejected this argument:
Our examination of the Consent Orders contained in the Record reveals that Exxon was not a party to any of the settlements, it did not pay any sum of money to *1185 the Government for release of any Exxon liability under these settlements, none of the consent orders mentions Exxon, or the Hawkins Field Unit, and, although some of the consent orders identify certain litigation terminated by the settlements, none mentions this litigation which was pending in the District of Columbia at the time the consent orders were executed. In the settlements, the Government agreed not to bring suit "against" the settling parties, and in the Conoco agreement "only civil claims by DOE against Conoco" were settled, while the Sun consent order only required the DOE to terminate actions "against Sun." None of the consent orders could, or did they, purport to release Sun, Conoco, etc., from suits by private parties for damages under Section 210 of the ESA, or for their liability to other parties, if any, for contribution, indemnification, unjust enrichment, or for other relief.
Any rights under the consent orders accrued solely to the settling parties and not to Exxon.
Id. at 1276 (citation omitted).
Exxon also argued that these settlements barred DOE from imposing derivative liability upon Exxon as operator. Exxon argued that any liability imposed upon it as operator was vicarious liability. TECA also rejected this argument:
It is readily apparent that Exxon's concern about settlements which may have been made by companies who are not parties to this litigation is in fact a concern about whether or not it will be successful in any future attempt to seek contribution or indemnity from those parties on account of any payment Exxon might make upon the judgment here. As we have previously pointed out, Exxon's liability is not a vicarious one, based upon ordinary notions of "agency." It has been found that Exxon was the "animating force" responsible for violating the crude oil pricing regulations, and this liability is not dependent upon finding of "joint liability" on the part of third parties who are not defendants in this action, or upon proof of Exxon's right to contribution or indemnity from those third parties.
Id. at 1276-77.
Conoco's liability as operator is not vicarious or derivative. The Agreed Judgment and various Consent Orders do not preclude DOE from pursuing Conoco for overcharges on properties which Conoco operated and in which Phillips, Texaco and/or Getty had a working interest. Whether Conoco is able to recover from the interest owners for overcharges received by them is not an issue in this action.

Computation issues and prejudgment interest
DOE seeks prejudgment interest at interest rates based on DOE's Policy Statement on Interest, 46 Fed.Reg. 21,412 (April 10, 1981). Normally, an award of restitution under ESA § 209 will include prejudgment interest. Lea Exploration, Inc. v. Department of Energy, 843 F.2d 510, 513 (TECA 1988). The standards for awarding prejudgment interest must be applied consistently, "since one of the principal reasons for the establishment of the Temporary Emergency Court of Appeals was Congress' intent that there be consistency throughout the United States for cases decided under the ESA." Id.
TECA has upheld this court's application of DOE's policy rates in the present case. In re: The Department of Energy Stripper Well Exemption Litigation (Chevron U.S.A., Inc. v. Department of Energy), 944 F.2d 914 (TECA 1991); In re: The Department of Energy Stripper Well Exemption Litigation (Oryx Energy Company v. Department of Energy), 944 F.2d 918 (TECA 1991). The court shall continue to use the DOE's policy rates.
DOE revised its calculations to account for Conoco's retroactive certification of certain properties. These new calculations delay the commencement of interest on overcharges attributable to properties which Conoco retroactively certified as stripper. Second Wesner Declaration, Doc. 2153 ¶ 8. The court finds this revision fair and appropriate.
DOE seeks the application of the United States Rule, that in applying partial *1186 payments to an interest bearing debt which is due, the payment should first be applied to the interest due. TECA has addressed the application of the United States Rule in this case, and has held that it shall apply to payments due after January 1983. In re: The Department of Energy Stripper Well Exemption Litigation (Chevron U.S.A., Inc. v. Department of Energy), 944 F.2d 914, 917 (TECA 1991).
Conoco argues that its partial payments should be applied first to compound interest. Pursuant to DOE's interest rate policy, DOE imposed simple interest prior to October 1, 1979. After that date, DOE began imposing compound interest on overcharges. Conoco argues that simple interest should be treated as principal and that its partial payments should be applied to the outstanding compound interest amounts. The difficulty with Conoco's position is that it has no support in the law or under basic accounting principles. DOE has applied partial payments first to the oldest outstanding interest amountsthe outstanding simple interest accruing prior to October 1, 1979. After the older simple interest amounts were paid off, partial payments were applied to the newer compound interest amounts. DOE's methods are consistent with generally accepted accounting principles. In previous decisions, the court has followed DOE's methodology. To be consistent with prior decisions in this case, the court must reject Conoco's argument regarding the application of partial payments first to compound interest.
Conoco next argues that overcharges should not begin to accrue interest until it actually received the monies from its purchaser, approximately two months after the sale. Under DOE's calculation methodology, interest begins to accrue at the end of the month in which the overcharge occurred (even if the overcharge occurred on the first day of the month). DOE credits payments to the first of the month in which the payment is made (even if the payment was made on the last day of the month). DOE's own computation methodology gives the oil producers a grace period of up to two months.
As noted by DOE, this court has given no other oil producer the benefit of a greater grace period. Indeed, restitution for overcharges should not hinge upon the specific accounting methods of each individual oil producer. The overcharge occurred at the time of sale. The fact that payment might not have been made immediately does not alter when the overcharge occurred. Keeping in mind the goal of consistency in these cases, the court must reject Conoco's argument. DOE's computations give Conoco a sufficient grace period to account for any delays in the actual receipt of payment.
The so-called "Cosden credit" (arising from a purchaser's refusal to pay the stripper price on oil from six properties) has already been taken into account in DOE's calculations. In its computation of Conoco's liability, DOE has included no overcharges for Cosden's purchases at controlled prices. The escrow deposits which Conoco mistakenly made for the Cosden purchases have been credited to other outstanding overcharges. Second Wesner Declaration, Doc. 2153, ¶¶ 5-6. Conoco is not entitled to a double credit. No further credit is due to Conoco for this matter.

Conclusion
With the exception of the State of New Mexico's interest in the Eumont Hardy property, the court finds that DOE has proven the existence of the alleged overcharges on the Conoco-operated properties. Imposition of operator liability on Conoco is appropriate in this case. The settlements with Phillips, Texaco and Getty do not bar recovery from Conoco. The computational arguments raised by Conoco are without merit. Judgment shall be entered in favor of DOE with prejudgment interest at DOE's policy rates until the date of judgment, and post-judgment interest as allowed by statute. Counsel for DOE shall prepare the journal entry of judgment.
IT IS BY THE COURT THEREFORE ORDERED that DOE's amended motion for summary judgment (Doc. 2150) is hereby granted in part and denied in part as set forth in this opinion and order.
IT IS FURTHER ORDERED that Conoco's motion for summary judgment (Doc. 2103) is hereby denied.
*1187 Counsel for the DOE shall prepare and submit the appropriate journal entry of judgment within thirty (30) days from the date of this opinion and order.
NOTES
[1] There is a great deal of discussion of division orders in the briefs, but no division orders have been provided to the court.
[2] DOE regulations permitted a property to be retroactively certified for two months prior to the month in which the certification was issued, thus allowing a retroactive price increase. Until the certification was issued, no basis existed for charging or collecting the higher price. Conoco retroactively certified some of the properties at issue here. Although some of Conoco's overcharges were effective in January 1978, DOE has agreed that they did not commence until March 1978. DOE has revised its initial calculations accordingly.
[3] Until it was abolished in 1993, TECA was the court which heard all appeals from cases arising under the Economic Stabilization Act and the Emergency Petroleum Allocation Act, including all appeals from the present multidistrict litigation. Any future appeals from this case now lie within the jurisdiction of the United States Court of Appeals for the Federal Circuit. 28 U.S.C. § 1295(a).